**In re McNEELEY, James N., Debtor.**

**James N. McNEELEY, Appellant,**

**v.**

**FIRST NATIONAL BANK OF CROSSETT, Appellee.**

**No. 81–1136.**

United States District Court,
W.D. Arkansas,
El Dorado Division.

Sept. 13, 1982.

**290**

MEMORANDUM OPINION AND ORDER

OREN HARRIS, District Judge.

In this case appellant-debtor, James N. McNeeley (Debtor) appeals from a judgment of the Bankruptcy Court for the Western District of Arkansas, El Dorado Division.[1] The bankruptcy court refused to discharge the Debtor from a debt owed to the First National Bank of Crossett (Bank) in the Debtor's Chapter 7 bankruptcy proceeding. The record of the case has been filed, and the parties have briefed the issues.

## JURISDICTION

Jurisdiction of this matter is vested in this court by 28 U.S.C. § 1334, which provides the district court with appellate jurisdiction of all final decisions of a bankruptcy court.

## STATEMENT OF FACTS

James N. McNeely and his wife, debtors in this bankruptcy proceeding, filed their petition for bankruptcy under Chapter 7 of the Bankruptcy Code on March 13, 1980. On April 8, 1980, the Bank objected to the discharge of the Debtor, pursuant to 11 U.S.C. § 523. The Bank contended Debtor provided fraudulent written statements which induced the Bank to make loans to the Debtor. Further, the Bank cited 11 U.S.C. § 727 and stated the Debtor fraudulently transferred money and equipment from its business and failed to satisfactorily explain the loss of these assets. A hearing was held on this objection and the discharge of Debtor was denied.

The Debtor was the owner of two shirt companies, Crossett Garments, Inc. (CGI), and Shirtmakers, Inc. (SI). Debtor's wife was also involved in the businesses.

The business of these companies was to take patterns and materials from their customers, piece the goods together and ship the goods as directed by the customer. At first CGI and SI would furnish labor and a

Henry C. Kinslow, Law Office of Ronald L. Griggs, El Dorado, Ark., for appellant.

Thomas S. Streetman, Arnold, Hamilton & Streetman, Crossett, Ark., for appellee.

certain amount of materials, but later began to purchase all of the materials from the customers.

Debtor obtained all of its operating capital from the Bank. The dispute in this case stemmed from an application by CGI and SI for a loan through Farmers Home Administration (FmHA) and the Bank in the amount of $600,000.00 in the spring of 1979. The loan was funded on April 26, 1979, at which time Debtor, as president of CGI, executed a security agreement with the Bank granting the Bank a security interest in the accounts receivable of the company. The security agreement provided that the Bank would advance CGI 90% of the face value of invoices assigned to the Bank as collateral for the loan. The security agreement further provided that the Bank was to mail a copy of any assigned invoice to the customer, notify the customer the invoice was assigned to the Bank and payment was to be made directly to the Bank.

The security agreement of April 26, 1979, was a change from prior methods of financing in that it provides "the account shall be a good and valid account representing an undisputed, bona fide indebtedness incurred by the Account Debtor for merchandise theretofore shipped or delivered pursuant to a contract of sale, or for services theretofore performed by the Debtor for its customer." (Pl.Ex. 2, Par. IV.) Under the agreement, CGI was to notify the Bank of "any happenings or events which would in any way effect (sic) the secured party's interest in the accounts receivable." (Pl.Ex. 2, Par. IV.)

The first objection of the Bank pertained to nine invoices assigned to the Bank totalling $192,333.74, on which the Bank loaned CGI the sum of $173,098.57. None of the loan was ever repaid. The bankruptcy court found that the nine invoices were fraudulent and were a basis for the finding of non-dischargeability.

Evidence as to these invoices given at the hearing and that given in depositions of the parties involved was contradictory. The Debtor admitted there were indeed nine invoices on which he obtained money. He further admitted that he never told anyone at the Bank the orders in the invoices had been cancelled and he was not going to manufacture any of the goods listed. Debtor testified that he did not immediately notify the Bank of this fact, although he was obligated to do so. Some of the officers testified that they always relied on the representations of the Debtor that the goods had been manufactured or shipped. There was evidence to show that these loans were gained by the Debtor on the basis of invoices that represented facts which were not true, and known by the Debtor not to be true.

The Debtor pointed out facts and evidence to show it was his understanding he was not obligated to have sold or manufactured the goods set forth in the invoices. Debtor alleged that the Bank certainly had knowledge of the true nature of the transactions, or had ample opportunity to find out that some of the goods were not, in fact, manufactured or sold. If there was a change in the policy of the Bank regarding these loans, Debtor stated he was never aware of such change, and never received a letter from the Bank regarding the change. Debtor stated he always thought the earlier practice of financing was in effect and that he did not need to have the goods either manufactured or sold before he could receive the advance financing. To Debtor, the Bank was as much to blame as Debtor for any improper loans made, and there was never any attempt to commit fraud against the Bank.

The transfer of money, goods and other assets from Debtor's companies to other companies just prior to Debtor's filing for bankruptcy was the second point which caused the bankruptcy court to deny the discharge. There was a transfer of approximately $157,000.00 in cash to the Tulane Shirt Company, the absence of nearly $150,-000.00 in inventory, and the transfer of $30,000.00 to $40,000.00 worth of goods to the Tulane Shirt Company. Also, equipment was transferred to Davis Industries. If the Debtor purchased materials from Tulane, there is the question of why Debtor

allowed Tulane to pick up approximately $40,000.00 worth of goods just before filing for bankruptcy. As to other goods that were transferred, the Bank alleges Debtor never did adequately explain their absence. Debtor attempted to explain these situations either as the purchase of materials, the transfer of goods to the rightful owners, or standard practice among shirt manufacturers. Debtor testified that funds paid by checks to Tulane Shirt Company were for purchase of materials from Tulane. Also, the fact that Tulane and others came and picked up shirts and other materials was due to Debtor's belief that these materials were not his, but were the property of others. Debtor explained that the loan of machinery to Davis Industries was a standard practice in the industry. Debtor also pointed out that the several pieces of machinery were later returned to the trustee prior to the sale of company assets.

## CONCLUSIONS OF LAW

Rule 810 of the Rules of Bankruptcy Procedure provides that: "Upon an appeal the District Court may affirm, modify, or reverse a referee's judgment or order, or remand with instructions for further proceedings. The Court shall accept a referee's findings of fact unless they are clearly erroneous, and shall give due regard to the opportunity of the referee to judge the credibility of the witnesses." *Matter of Financial Corporation,* 1 B.R. 522 (D.C.Mo. 1979); affirmed 634 F.2d 404 (8th Cir.1980).

■ After reviewing the record, this court is of the opinion the findings of fact of the bankruptcy judge of fraudulently obtained loans and the transfer of money, goods, and equipment, and the denial of Debtor's discharge on these grounds were not "clearly erroneous." Hence, the judgment of the bankruptcy court should be affirmed.

■ The question of intent to deceive, pursuant to the provisions of 11 U.S.C. §§ 523 and 727, are questions of fact for the bankruptcy judge. *Matter of Nelson,* 561 F.2d 1342 (9th Cir.1977). In the present case, the facts offered by the parties are conflicting. The Bank argued, and the bankruptcy judge found, the Debtor fraudulently obtained loans, representing to the Bank that goods had been manufactured or shipped. This was in violation of the security agreement between the parties. Despite Debtor's contention of culpability of the Bank, this Court has determined that the holding of the bankruptcy court is correct. There was sufficient factual basis for the bankruptcy court to find the requirements of § 523 were met and the denial of Debtor's discharge was proper.

■ Also, this Court determines the bankruptcy court correctly found Debtor was also to be denied a discharge on the basis of the transfer of goods to Tulane, and the transfer of equipment and other goods to other companies. The Court is of the opinion there is sufficient evidence to allow the bankruptcy court to determine, under 11 U.S.C. § 727, the bankrupt inadequately explained a transfer of assets. Debtor attempted to explain these transactions. This Court will not reverse the bankruptcy court's ruling on an issue which turns on the credibility of the witnesses. The Court does not find the ruling to be "clearly erroneous."

IT IS, THEREFORE, THE ORDER of this Court that the judgment of the Bankruptcy Court for the Western District of Arkansas, El Dorado Division, be and the same is affirmed.